SHELTON v. GLOBE CONSTRUCTION COMPANY

(January 16, 1928. Opinion and Decree.)

(*Syllabus by the Court*)

1. **Louisiana Digest — Appeal — Par. 625, 636.**

Decision of trial judge on the question of fact as to existence of a special contract for sale of stock will be affirmed where the evidence is conflicting and there is no manifest error in his decision.

2. **Louisiana Digest—Brokers—Par. 15, 20, 23.**

Where there is a dispute as to exact amount of commissions owed and there is evidence tending to prove that certain stock subscription notes were cancelled with plaintiff's approval there will be judgment only for amount admitted by defendant.

3. **Louisiana Digest — Brokers — Par. 5; Mandate—Par. 38.**

Civil Code, Art. 2976, making the agent liable if unauthorized to substitute implies that he is not liable if authorized; and the power is granted, when the principal ratified and approved employment of sub-agents by plaintiff.

Appeal from Division "A", Civil District Court. Hon. Hugh C. Cage, Judge.

Action by Byron E. Shelton against Globe Construction Co., Inc.

There was judgment for plaintiff and defendant appealed.

Judgment amended and affirmed.

T. H. McGiehan, of New Orleans, attorney for plaintiff, appellee.

H. M. Ousley, of New Orleans, attorney for defendant, appellant.

JONES, J.  Plaintiff sued for nine hundred eighty-five and 50-100 ($985.50) dollars, alleging that he had made a verbal contract with defendant in August, 1922, to sell its stock on a commission basis, as follows:  Twenty-five per cent on all stock sold personally by petitioner and ten per cent on all stock sold through sub-agents employed by petitioner; that he personally sold stock aggregating nine hundred ($900.00) dollars on which he is due a commission of two hundred twenty-five ($225.00) dollars, less a credit of thirty-five ($35.00) dollars (amount already paid by defendant); that he sold through his agents stock aggregating twelve thousand forty and 00-100 ($12,040.00) dollars on which he is owed ten per cent commission, amounting to one thousand two hundred four and 00-100 ($1,204.00) dollars, less a credit of four hundred .eight and 50-100 ($408.50) dollars, the total amount due being the amount claimed.

Plaintiff attached to and made part of his petition carbon copy of his letter to defendant, dated May 23rd, 1923, in which he sets forth, according to defendant's figures, the various sales made by him personally and those made by his sub-agents, hired by him with approval of defendant's president. In this letter plaintiff gives the names of various stock purchasers, ·the amounts purchased, the credits allowed, the letter showing the balance due him the exact amount claimed.

Defendant filed a general denial to this petition.

On the first trial of the case the trial judge refused to admit any evidence tending to show a contract different from the one sued on and gave judgment for plaintiff as prayed.

As defendant .quoted in his petition for a new trial various decisions of the Supreme Court tending to show that the rejected evidence was admissible under a general denial, a new trial was granted, which resulted in a like decision below. From this decision defendant has appealed suspensively to this court.

On the trial plaintiff, through· its president, E. J. Kelly, sought to show that plaintiff had made a verbal contract in August, 1922, for fifteen per cent commission on amounts collected on sales and that the president, who owned fifty-one per cent of the stock of the company, had later at a time not fixed definitely, verbally agreed to pay plaintiff an additional ten per cent on all his sales for supervising the work of sub-agents to be employed by plaintiff and for soliciting by plaintiff of signatures to certain petitions for paving on various streets.

Although plaintiff took out a writ of subpoena duces tecum for all the books of defendant, the only books brought into court were the check books and the stock book of defendant, which seems to have handled the entire matter in a loose, unbusinesslike way.  Several paid checks were filed in evidence by both plaintiff and defendant and some of these bear notations referring to certain stock sales, others are blank as to all explanatory details.  As might be expected where all important contracts are made verbally and no detailed books were kept, there is much conflicting evidence as to all important items and as to all payments. From the mass of contradictions and confused statements, which this long record contains, we think the following facts are clear:

(1) Plaintiff was attracted by the following advertisements, which appeared in the Times-Picayune on Sunday, August 6th, 1922:

"SALESMAN—Security, $50 weekly guarantee with highest commission, 100 per cent co-operation. Red hot leads, proposition talk of town. Here is the psychological moment you've been waiting for. Grasp it now and forget your financial troubles. What I can do you can do, I am no wizard, yet I get gratifying results with this proposition. See me Monday from 10 to 3. Mr. R. Kelly, 301 Louisiana Building."

(2) Plaintiff made a verbal contract on August 8th with defendant's then sales manager, R. E. Kelly, a brother of the president and then a director of the company.

(3) On February 25th, 1923, plaintiff with defendant's approval inserted in the Times-Picayune the following advertisement:

"THREE REAL STOCK SALESMEN to call upon direct leads closing out small issue in going local concern. Highest commissions. See Mr. Shelton, 10 a. m. to 12 a. m., Monday. 301 Louisiana Bldg."

(4) In answer to this advertisement and possibly before plaintiff employed with defendant's approval several sub-agents, among them, Mazur, Barnett and Doty, and these sub-agents were paid immediately for their individual stock sales by plaintiff by check for which plaintiff was later reimbursed by the check of the defendant. Defendant's president explains this round-about method of payment by stating that he did not know these sub-agents and preferred plaintiff's checks because they were so prepared as to make it difficult, if not impossible, to raise the amount, a statement corroborated by plaintiff's paid checks, filed in the record.

(5) Although plaintiff, apparently both from the checks in evidence and also from the testimony of both plaintiff's and defendant's witnesses, began work at once and continued until the last of March to devote much time and effort to the business, being especially active in February and March, 1923, he did not secure a permit to sell stock from the Louisiana Securities Commission until December 19th, 1922. This permit contains the following notation:

"This stock must be sold at a price not to exceed its par value. The total expense of disposing of this stock must not exceed fifteen per cent of the par value of the stock sold."

Mr. Luther Hall, clerk for the commission, testified that if a violation of these clauses was brought to the attention of the commission, the permit of the violating agent would be recalled, but that the commission did not exact reports from the agents showing amounts and prices of sales nor did it take any steps to find out whether these requirements were carried out as written. It was shown by other witnesses that expenses greater than fifteen per cent for sale of stock were sometimes charged to promotion account.

(6) On March 10th, 1923, the president of defendant company wrote a letter to plaintiff reading as follows:

"March 10th, 1923.

"Mr. B. E. Shelton,
"Sales Manager,
"Office.
"Dear Sir:
"Your request for a statement and a settlement of your commission accounts shows the following:

"Commissions earned by you since
  March 3rd to date _____$623.00
"Less advance for expenses_____ 285.00

"Leaving balance due you on this
  business _____$368.00
"Commissions also are due you on
  notes uncollected _____ 225.00

"Total amount due you to date_____$593.00

"While all the business turned in is good business as the notes are all signed by property owners and will be paid as they mature, you will recall our understanding that you were to be paid when collections are made.

"I wish you would get real busy on these notes and collect the accounts outstanding so I can draw a check in your favor for the above amount to meet your pressing needs that you mentioned.

"Our business is now in good shape and I will look for you to keep up the good work you have started.
  "Yours very truly,
  "GLOBE CONSTRUCTION CO., INC.,
                            "By President.
"EJK."

(7) Defendant apparently admits that the sales were made by plaintiff or his sub-agents as claimed, but defendant tried to prove that the sales were made on the strength of fraudulent representations by plaintiff or his agents and that the notes taken in part payment of purchase price were in many instances cancelled by it later on when the true facts came out.

Plaintiff is shown to have written on the subscription contract which he secured from Eugene Daste "10 percent guarantee" and defendant is shown to have cancelled this contract and returned Daste's check of fifty ($50.00) dollars, (which had been paid on account), as soon as the attention of Director Dazet was called to this guarantee. In explanation of this action, plaintiff states that it was done with the approval of President Kelly and that the duplicate of the subscription contract was

shown this officer and kept by him, but no duplicate was produced nor was its existence proved.

This was the only instance in which any attempt at misrepresentation was brought home to plaintiff, but defendant's president testifies that many subscriptions were cancelled and many compromised on account of misrepresentations by Sub-agent Mazur, who seems to have told various subscribers that the company would shortly be taken over by an Eastern syndicate and the price advanced at least four ($4.00) dollars per share.

This man Mazur was retained as a stock salesman by defendant after plaintiff left.

(8) The stock book showed that certificates had been issued to each of plaintiff's subscribers and several of them so testify, although some of them said they had not bought through plaintiff and did not know the name of the agents who sold them. Plaintiff further showed his good faith by subscribing to twenty-five shares of the stock himself.

(9) Defendant instructed all agents to get twenty or twenty-five per cent in cash and balance in notes and these instructions were usually carried out, but sometimes they took notes for entire amount.

The disputed facts are as to the terms of the contract and as to defendant's authorization and approval of employment by plaintiff of sub-agents to sell the stock.

The judge of the lower court found that the plaintiff had a contract as claimed in his petition and we can not say that he manifestly erred, although there is much evidence for and against.

Plaintiff swears he had a contract originally for fifteen per cent on all sales made by him and later in February, 1923,

a new agreement was made for ten per cent additional on all sales made by him and ten per cent on all sales by his sub-agents. He refers to sales made by him or his sub-agents to Dr. Bernadas, Eugene Dumas, Geo. H. Turner, Mrs. Gardain, Mr. Mayer and a man named Roevens as instances in which he was paid twenty-five per cent by defendant, but he did not cite any names of purchasers sold by sub-agents, on which he had been paid ten per cent.

Dr. Huhner, against whom this defendant obtained a judgment for two hundred ten ($210.00) dollars on a stock subscription note in a case entitled Globe Construction Co. vs. Dr. J. S. Huhner, 3 La. App. 259, on the ground that his allegations of fraudulent misrepresentations of Agent Mazur were not proved, testifies in this case that President Kelly asked him "if he was a poor sport" when he called up to know if any Eastern company was going to buy defendant company at an advanced price.

Thos. Malynn answered, when asked if anyone had made guarantee to him about advance in stock: "When I saw Mr. Kelly (the president) he said that there was a syndicate that would take them. He said he had a syndicate that had offered that, but he would not take their proposition."

The subscription contract on a printed form of the defendant for twenty-eight shares of Dr. Huhner, dated March 14th, 1923, offered in evidence by defendant, reads as follows:

"I or we subscribed for twenty-eight shares of the Globe Construction Co. stock at $10.00 per share, par value, for which I agree to pay $70.00 cash and balance $210.00 in 90 days from date, as evidenced by promissory note of even date."

The Globe Construction Company agrees that on receipt of notice from bank that the promissory note herein referred to has been paid; that they will deliver certificate for 28 shares of their capital stock.

There is no prohibition on the contract form of verbal representations by selling agents and there is apparently no reason why stock certificates should have been delivered, unless notes were paid, but there is evidence tending to show this was occasionally done.

Plaintiff swears he was to get his twenty-five per cent out of amount first paid to take care of salesmen, but Kelly would only give him fifteen per cent to pay sub-agents and promise to pay balance later. In this he is somewhat corroborated by Kelly who swears that he never made any deinite settlement with Shelton, but was awaiting the sale of their entire stock for a final accounting.

We also agree with the trial judge in thinking that the employment of these sub-agents was approved and ratified by President Kelly, for the February advertisement of plaintiff, quoted above, and the prompt reimbursement by the defendant of plaintiff for the fifteen per cent paid the sub-agents by Kelly and the retention of Mazur in its employment after plaintiff's departure hardly tally with Kelly's contention that he had nothing to do with the employment of these men, but rather support plaintiff's statement that Kelly was present when they were employed and gave them their instruction as to selling.

If these sub-agents were entitled to fifteen per cent as Kelly admits, then plaintiff, their supervisor and general director, was certainly entitled to something more than they were and ten per

cent extra for this work does not seem exorbitant. Kelly admits this, but says he agreed personally to pay this additional ten per cent, as he owned fifty-one per cent of the stock. As he admits that all these payments were made by defendant's checks and carried as debits in defendant's accounts, we agree with the trial judge that the preponderance of evidence is with plaintiff on this point.

Defendant seeks to show that many subscription notes were cancelled, although they were originally received as satisfactory, when makers claimed fraud, and that many were compromised and only part payment accepted. The trial judge correctly ruled that neither fraud nor payment had been pleaded and therefore he would not consider any testimony on these points, but would permit testimony as to cancellation of notes to show that plaintiff had not earned what he claimed. Under this ruling Kelly testifies that various subscription notes on which plaintiff claimed commissions had been cancelled rightly by defendant because plaintiff was not to be paid until all notes were settled. In this statement President Kelly is corroborated by Secretary-Treasurer Dalgarn, who testified as follows:

"Q. Mr. Dalgarn what connection have you with the Globe Construction Company, the defendant in this suit?

"A. I am the secretary and treasurer.

"Q. In 1922, what was your connection?

"A. Vice-president.

"Q. Who was in active charge of the company's affairs?

"A. Mr. E. J. Kelly, the president.

\*   \*   \*   \*

"Q. Did you have any connection with the making of the contract between Mr. Shelton and the Globe Construction Company?"

After some colloquy Mr. Dalgarn answered "Yes".

"Q. What connection did you have?

"A. I was called into the office and Mr. Kelly said, we have employed Mr. Shelton to sell stock for the Globe Construction Company, and recited the agreement they had."

By the Court:

"Q. In the presence of Mr. Shelton?

"A. Yes, sir."

By Mr. Ansley:

"Q. What was the agreement?

"A. He was to get 15% on all stock he sold and was empowered to employ as many salesmen as he wanted. I asked the question, 'Does it mean 15% on all stock sold or 15% on the amount paid in?' and Mr. Kelly said he was to get 15% of the amount paid in.

"Q. Mr. Kelly, the president, and you, the vice-president, and Mr. Shelton were in conference in reference to this contract?

"A. Yes, sir."

On the other hand, plaintiff swears that he was to be paid when notes were verified or approved by the corporation and on this point he is corroborated by Robert E. Kelly, formerly a director of the company in charge of stock sales, who inserted the advertisement of August 6th, 1922, and who testified as follows:

"Q. You are sure if he sold $100.00 of stock he would get $15.00?

"A. Yes, sir, if it was a cash sale and if it was notes and the notes were all right and there was some payment on the notes or a check with the order and notes that were all right."

By the Court:

"Q. Do you mean if accepted by the corporation?

"A. If they were verified.

"Q. How do you mean?

"A. By calling the people up and the people said they were all right.

"Q. That is what I mean. If you were satisfied with the financial standing of the people who gave the notes you considered the notes verified?

"A. Yes, sir.

By Mr. McGiehan:

"Q. We will consider this as an example: Suppose Mr. Dazet would buy 100

shares of stock, which was $1000.00, the salesman would bring in $250.00 in cash?

"A. Twenty-five per cent or more.

"Q. And a note for $750.00 or less and he turned that $250 over to Mr. Kelly and turned the notes over to the defendant and Mr. Kelly verified the signature by phoning the man and accepted it, would he pay the salesman 15% on that sale?

"A. I do not see any reason why he would not.

"Q. Is that the way he did it?

"A. Yes, sir."

* * * *

"Q. Why did you put in this advertisement $50.00 a week if you say the only proposition you made was 15%?

"A. You will notice it says $50.00 top guarantee. That guarantee is a guarantee to a man provided he guarantees something.

"Q. It was simply a catch?

"A. Yes, purely.

"Q. You stated in answer to Mr. Ansley that Mr. Shelton was to be paid something extra for checking up and handling salesmen and other work?

"A. I understood he was to get something extra for handling promotion work on the streets and other things and also for selling stock.

"Q. And for selling stock?

"A. Yes for checking up the men and seeing the notes were sold on the square.

"Q. He did that?

"A. I presume so. When Mr. Shelton came in I was getting ready to step out.

* * * *

"Q. Did not Mr. Vernes get 10% at that time extra?

"A. I knew that Mr. Vernes was working and got his money on week days and Saturday. In fact some of the men got money they should not have gotten. It was good fellowship. I did not write the checks.

"Q. You had supervision of the salesmen and they told their troubles to you?

"A. Yes, sir.

"Q. If Mr. Vernes made a sale on Thursday of $500.00 and brought in $200.00 in cash, he got 15% immediately and on Saturday he got the balance?

"A. I suppose so.

"Q. You knew they were paid?

"A. Yes, otherwise they would make a holler.

* * * *

"Q. Did Mr. Shelton succeed in getting subscriptions for Washington Avenue?"

By the Court?

"You say subscriptions. You mean signatures to petitions?"

By Mr. McGiehan:

"Yes, sir, Judge."

"A. Washington Avenue is in three sections.

"Q. He got Washington Avenue from Coliseum to Magazine, a $23,000.00 job?

"A. I think so."

The record contains several paid checks given plaintiff by defendant, which plaintiff contends were given in payment of his twenty-five per cent commission, and defendant contends were given as advances, but when told by the trial judge that the overwhelming percentage of check stubs referred to special stock sales and asked if these checks represented advances only why special stock sales were referred to at all, he replied: "I have no reasonable answer".

After careful consideration and study of the entire record, we have reached the conclusion that plaintiff is entitled to additional compensation for his work, but we do not think that he has proved his entire claim, as undoubtedly some of the subscription notes received by him or his sub-agents were cancelled with his knowledge and apparent approval. We, therefore, think substantial justice will be done by allowing the amount admitted by defendant and to be due plaintiff in the above quoted letter of March 10th, 1923, namely five hundred ninety-three and 00-100 ($593.00) dollars.

For above reasons the judgment of the lower court is, therefore, amended by reducing the amount allowed as above stated and accordingly

It is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, B. E. Shelton, and against defendant, Globe Construction Company, Inc., in the sum of five hundred ninety-three and 00-100 ($593.00) dollars with interest from judicial demand, costs of this appeal to be paid by plaintiff and appellee.